## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**CLARE HARRIGAN**  )
2100 Westview Terrace  )
Silver Spring, Maryland 20910  )
(240) 643-9277  )
clareharrigan1@gmail.com  )
)

              Pro Se Plaintiff

                vs.

**BENJAMIN S. CARSON, SR.**
Secretary, United States Department  )
 of Housing and Urban Development  )
451 Seventh Street, S.W.  )
Washington, D.C. 20410  )
)
              Defendant  )

Case: 1:17-cv-00930     (H-Deck)
Assigned To : Jackson, Amy Berman
Assign. Date : 5/17/2017
Description: Employ. Discrim.   Jury Demand

## COMPLAINT AND DEMAND FOR JURY TRIAL

### I. PRELIMINARY STATEMENT

1.     This action is brought by plaintiff, Clare Harrigan, against the U.S. Department of Housing and Urban Development (HUD) for gender-based employment discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended.

2.     From 1991 to 2007, plaintiff worked as a trial attorney and, after her promotion, a senior trial attorney in HUD's Office of General Counsel (OGC), in the Office of Litigation (OOL). The OOL defends litigation brought against HUD. During her tenure in the OOL, plaintiff received consistently outstanding annual evaluations with glowing

narratives about her work and she accomplished the dismissal of every new case assigned to her.

3.      The OOL is a small office with approximately ten staff-level attorneys. In the summer of 2005, Nancy Christopher was named Associate General Counsel and senior manager of the OOL. Immediately following her appointment, Ms. Christopher created a hostile work environment for all of the older, female staff attorneys. Over the four-year period following her appointment, Ms. Christopher completed the successive involuntary removal from the OOL of five, older, accomplished, female staff-level attorneys, including the plaintiff. Ms. Christopher removed half of the staff-level attorneys in her chain-of-command and they all shared the same protected class.

4.      In January 2007, after her successful removal of two attorneys, Ms. Christopher turned her attention to the plaintiff and intensified her hostile campaign to undermine the plaintiff's professional reputation and career. In June 2007, plaintiff was forced out of the OOL to avoid career threatening discriminatory adverse actions.

5.      In April 2007, plaintiff exercised her protected rights by initiated the administrative EEO process at HUD's Office of Departmental Equal Employment Opportunity (ODEEO). Since April 2007, managers in Office of General Counsel (OGC) have collaborated with the ODEEO to prevent the impartial administrative adjudication of the plaintiff's discrimination and retaliation claims. The OGC and the ODEEO have openly, flagrantly, and notoriously violated the regulations that govern the administrative processing, investigation, and determination of the plaintiff's EEO claims, including, among other things:

   a) failing and refusing to allow an adequate and impartial investigation of the plaintiff's discrimination and retaliation claims;

2

b) replacing multiple independent investigators assigned to plaintiff's case;

c)  removing affidavits and documents from the official investigative file;

d) replacing affidavit testimony of HUD officials to include new defenses, after the investigation is closed;

e) chopping up plaintiff's discrimination and retaliation claims into multiple progressive administrative complaints and then dismissing plaintiff's claims because those claims were not included in earlier complaints;

f) failing to meet most regulatory deadlines by months and sometimes by years, while requiring plaintiff' to strictly adhere to all deadlines (which were often very short and challenging for the plaintiff) to avoid the dismissal of her complaints;

g) lying and knowingly encouraging others' to misstate facts, including in sworn testimony; and

h) openly and flagrantly defying appellate orders of the Equal Employment Opportunity Commission, which required HUD to conduct an appropriate, impartial investigation and determination of plaintiff's discrimination and retaliation claims.

6.      Over a period of several years HUD officials were unrelenting in their efforts to discourage plaintiff from exercising her protected rights under Title VII, by preventing the impartial administrative processing, investigation, and decision of plaintiff's discrimination and retaliation claims.  The actions of HUD officials caused plaintiff to waste thousands of hours of her time participating in an intentionally failed administrative process and their actions were frustrating, demoralizing and painful to the plaintiff. Through their actions, HUD officials intended to dissuade the plaintiff from continuing to pursue her protected rights under Title VII and, therefore, their actions violated the Title VII prohibition on retaliation.

7.      In addition, during the interminable ten-year, failed EEO administrative process, to scare plaintiff, officials in the Office of General Counsel (OGC) engaged in vicious acts of retaliation against the plaintiff and against her friend and former OOL co-worker

Terri Roman, who supported plaintiff's EEO activities.  Some of the most serious acts of

retaliation committed by OGC officials included:

a) falsely accusing plaintiff of an attempted violent felony and arranging for the public investigation of the alleged crime by two federal law enforcement bodies;

b) falsely accusing plaintiff and Ms. Roman of non-violent criminal acts and arranging for the public investigations of those false allegations;

c) officially sanctioning plaintiff based on false, contrived grounds;

d) attempting to suspend plaintiff without pay for two weeks based on false, contrived grounds;

e) suspending Ms. Roman without pay based on false, contrived grounds;

f) proposing the termination of Ms. Roman's employment, based on false, contrived grounds;

g) preventing plaintiff's lawfully required transfer to the then newly created Federal Housing Finance Agency; and

h) threatening plaintiff with the loss of her federal employment.

8.      Over a period of several years HUD officials took multiple adverse actions against the plaintiff.   These actions by HUD officials were frightening, painful and demoralizing to plaintiff.  Through these actions HUD officials intended to dissuade the plaintiff from continuing to pursue her protected rights under Title VII and, therefore, their actions violated the Title VII prohibition on retaliation.

9.      Over a period of several years HUD officials took multiple adverse actions against the plaintiff's friend and supportive former co-worker, Terri Roman.  These actions by HUD officials were frightening, painful and demoralizing to plaintiff.  Through adverse actions taken against Ms. Roman, HUD officials intended to dissuade the plaintiff from continuing to pursue her protected rights under Title VII and, therefore, their actions violated the Title VII prohibition on retaliation.

4

10. This case seeks redress for defendant's discrimination against the plaintiff on account of her sex and for defendant's retaliation against the plaintiff for exercising protected EEO activity. Plaintiff seeks the following relief:

a) declaratory and injunctive relief;
b) record correction;
c) compensation for leave used as a consequence of defendant's unlawful acts;
d) compensation for the hours spent on tasks related to the unlawful, failed administrative processing of administrative EEO complaints;
e) an award of attorneys' fees and costs incurred in the prosecution of this action and the administrative proceedings which preceded it;
f) compensatory damages in the maximum amount allowed by law.

## II. PARTIES, JURISDICTION, AND VENUE

11. Plaintiff Clare Harrigan has been employed by the federal government since September 29, 1991. The actions relevant to this complaint arise from plaintiff's employment as a Senior Trial Attorney in the Office of General Counsel at the U.S. Department of Housing and Urban Development. The plaintiff is a female and resides at the address recited in the cation of this complaint.

12. Defendant Benjamin S. Carson, Sr. is the Secretary of the U.S. Department of Housing and Urban Development (HUD), the Cabinet official who heads HUD, and is sued in his official capacity only. HUD is a department in the Executive Branch of the federal government, the mission of which is to provide and encourage the provision of moderate and low income housing in the United States.

13. Jurisdiction of this Court is based upon 28 U.S.C. § 1332; and 42 U.S.C. § 2000e-16 (incorporating by reference 42 U.S.C. § 2000e-5(c)). Venue lies here pursuant to 42 U.S.C. § 2000e-16 (incorporating by reference 42 U.S.C § 2000-5(f)(3)), because the actions of the defendant were taken by defendant's senior managers from their duty stations in this judicial district, where plaintiff was employed.

**III. FACTS**

**A.     The *Browne* and *Roman* Title VII Actions Against HUD**

14.     HUD OGC's Deputy General Counsel Linda M. Cruciani and Associate General Counsel Nancy Christopher are two of the Responsible Management Officials (RMOs) in this case.  They are also named RMOs in many other pending and closed EEO administrative complaints.  In due course, two of those administrative complaints were litigated in this court.

15.     Ms. Cruciani was the RMO in *Marsha G. Browne v. Shaun Donovan*, CA No. 12-696 (D.D.C. Aug. 5, 2014) which was settled by the entry of judgment in Ms. Browne favor, for $356,000.00 and additional relief.

16.     Ms. Cruciani and Ms. Christopher were named RMOs in *Terri L. Roman v. Julian Castro*, CA No. 12-1321 (CRC) (D.D.C. Jan. 30, 2017).  After a 6-day trial, the jury deliberated for less than 2 hours before they ruled in favor of Ms. Roman and awarded her $800,000.00 in compensation.  On January 6, 2017, the court entered a judgement in favor of Ms. Roman in the amount of $1,030,000.00.

17.     Sworn testimony and documents presented in the *Browne* and *Roman* cases demonstrate many of the factual allegations herein.

**B.     Acts of Discrimination and Retaliation**

18.     Plaintiff Clare Harrigan worked at HUD from 1991 to 2011.  She was a trial attorney from 1991 to 2001 and a senior trial attorney from 2001 to 2007, in the Office of Litigation (OLL), within the Office of the General Counsel (OGC).  During her tenure in the OOL, plaintiff received consistently outstanding annual evaluations with glowing narratives about her work and she accomplished the dismissal of every new case assigned to her.

19.   The OLL is a small office with approximately ten staff-level attorneys.  The office defends litigation brought against HUD.

20.   In the summer of 2005, the General Counsel appointed a new director for the OLL, Associate General Counsel Nancy Christopher.   Immediately following her appointment, Ms. Christopher created a hostile work environment for the older, female staff attorneys in the office.

21.   During the four-year period following her appointment, Ms. Christopher fired or involuntarily removed five, accomplished, older female staff attorneys from the OOL. Eventually four of the attorneys filed complaints.

a)  Shari Weaver – In November 2005, Ms. Weaver stopped coming to work to avoid Ms. Christopher's hostile, discriminatory adverse actions. HUD settled Ms. Weaver's administrative discrimination complaint for an unknown amount of relief.

b)  Ramona Fine – In October 2006, Ms. Christopher had Ms. Fine's attorney position eliminated.  Ms. Fine was hired as a staff attorney at the Department of Justice.

c)  Clare Harrigan – In June 2007, plaintiff transferred out of the OOL to avoid career-threatening, unjustified adverse actions.  After ten years in the administrative process, plaintiff's employment discrimination and retaliation claims were dismissed by HUD without ever completing an adequate, impartial investigation.

d)  Terri Roman – In November 2008, Ms. Roman was involuntarily transferred out of the OOL, after suffering multiple unjustified adverse actions culminating in a failed attempt to terminate her federal service.  Ms. Roman spent five years in a failed attempt to obtain an impartial administrative investigation and determination of her EEO claims.  Eventually, she was forced to adjudicate her claims in a federal court action, *Terri L. Roman v. Julian Castro*, CA No. 12-1321 (CRC) (D.D.C. Jan. 30, 2017).  After a six day trial, the jury in Ms. Roman's case deliberated for less than 2 hours before they ruled in her favor and awarded Ms. Roman $800,000.00 to compensate her for HUD's vicious retaliation.  On January 6, 2017, the court entered a judgement in favor of Ms. Roman in the amount of $1,030,000.00.

e)  Marianne Morris – In October 2009, Ms. Christopher terminated Ms. Morris's federal service without any notice and without due process.  The MSPB denied Ms. Morris's complaint.

7

21.    From the time Ms. Christopher arrived in the OOL, she seemed disappointed that plaintiff was well liked and respected by her clients and co-workers.  From August 2005 to June 2006, Ms. Christopher took a variety of actions to undermine plaintiff's professional reputation and career.  Some examples include:

a) Ms. Christopher made unsolicited contact with plaintiff's clients to offer assistance, since plaintiff had a difficult personality.

b) In September 2005, Ms. Christopher would not permit plaintiff to advise her clients about a court order finding that the Department of Justice was responsible for over a million dollars in attorney's fees that had been paid by HUD.  HUD was never reimbursed by DOJ, because Ms. Christopher did not allow anyone to know that plaintiff had been successful in her efforts to secure that court order.

c) In late December 2005, plaintiff repeatedly notified Ms. Christopher about a problem in a case and asked to discuss potential resolutions.  Without explanation, Ms. Christopher ignored the warnings and would not meet with the plaintiff until it was a serious problem.  Then Ms. Christopher explained to everyone involved in the case that plaintiff failed to timely notify her; that plaintiff's difficult personality was the primary cause of the problem; and, that plaintiff had a difficult time accepting responsibility for her mistakes.

d) Ms. Christopher assigned plaintiff and her co-worker Terri Roman the task of preparing some of the training materials for topics the OOL would present at the Office of General Counsel's 2006 Annual Field Counsels' Meeting.  During the period that plaintiff was preparing the materials, on three occasions, Ms. Christopher reminded plaintiff that she and Ms. Roman must prepare the training materials, but they were not allowed to present the training or even attend the annual meeting.  Instead, Ms. Christopher had a young male OOL attorney assist her in presenting the trainings that were prepared by the plaintiff and Ms. Roman.

22.    On June 25, 2006, plaintiff's husband was the victim of an armed robbery and was shot seven times.  Prior to shooting plaintiff's husband, the bad guy repeatedly threatened to harm his family.  No one has ever been arrested for the crime.  For several months after the shooting, plaintiff worked part time while she cared for her husband and dealt with other consequences of the event.

23.     While plaintiff was out, Ms. Christopher removal the second older female staff-level attorney from the OOL.

23.     In January 2007, when plaintiff was back in the office full time, Ms. Christopher intensified her hostile campaign to undermine the plaintiff's professional reputation and career.

24.     In early January 2007, Ms. Christopher assigned her recently hired Associate General Counsel, Gerald Alexander, to supervise plaintiff's work.  As a senior trial attorney, with many years of successfully experience handling OOL cases, it was very odd and unusual for plaintiff to be supervised by Mr. Alexander.

25.     During plaintiff's 15 years working in the OOL, plaintiff never experienced anything like Mr. Alexander's hostile oversight of her work.  Mr. Alexander repeatedly told plaintiff that he did not know the substantive law that the OOL relied upon to defend its cases and that he was depending on plaintiff's expertise.   Nevertheless, he closely scrutinized and questioned every aspect of the plaintiff's work in a condescending and hostile manner.  Mr. Alexander demanded multiple drafts of all written work and was extremely critical.  Because he did not know the substantive law, Mr. Alexander often unreasonably inflated the importance his minor editorial concerns.

26.     On January 16, 2007, Mr. Alexander was red-faced and infuriated with the plaintiff when an Assistant U.S. Attorney refused to incorporate his last in a long series of non-substantive edits to a brief.  Plaintiff found Mr. Alexander behavior frightening.  After this encounter, plaintiff asked Ms. Christopher to be treated like the OOL's male senior trial attorney, who was not supervised by Mr. Alexander.  Over the next several months, many

times Ms. Christopher changed her position about whether Mr. Alexander was or was not plaintiff's supervisor.

27.    During this period, according to Mr. Alexander's sworn testimony in the *Roman* case, he began keeping a file on plaintiff that contained, among other things, email exchanges and notes to himself about plaintiff's poor performance.

28.    During this period, several HUD employees reported to plaintiff that Ms. Christopher had expressed a false concern about the plaintiff's mental health and stability. And, that Ms. Christopher suggested that plaintiff's stressful personal life was interfering with her ability to do her job, which embarrassed plaintiff.

29.    Documents admitted in the *Roman* case include a March 19, 2007 email exchange between Ms. Christopher and Mr. Alexander, in which they referred to plaintiff and Ms. Roman as problem number 1 and problem number 2.  The email discussed their plan to demonstrate that plaintiff and Ms. Roman fail to meet deadlines on assigned tasks.

30.    During this period, among other hostile acts, Ms. Christopher and Mr. Alexander created tasks for the plaintiff with very short deadlines.  They wanted plaintiff to fail to meet their demands.  A few examples include:

a) On January 18, 2007, Mr. Alexander knew that the plaintiff left the office at 3:00 P.M. to drive her husband to view a line up at the prosecuting attorney's office.  Mr. Alexander also knew that this would be a very stressful event for plaintiff and her family.  Nevertheless, at 5:31 P.M., Mr. Alexander sent plaintiff an email directing her to research and rewrite a brief by the next day and, in order to meet that deadline, Mr. Alexander further directed the plaintiff to begin work on the brief "pronto."

b) In February 2007, although plaintiff was very busy and working very long hours, Ms. Christopher assigned plaintiff a new complex, time-consuming case.  When she made the assignment, Ms. Christopher explained to plaintiff that although there were other attorneys who were not busy, because opposing counsel was particularly difficult and unpleasant, she was assigning the case to plaintiff who was her most experienced attorney.  Ms. Christopher's intent was to assign plaintiff stressful tasks and so many tasks that plaintiff could not timely complete all tasks.

c) On March 20, 2007, plaintiff, Ms. Christopher, Mr. Alexander, and the Assistant U.S. Attorney (AUSA) assigned to a case all conferred and agreed on a plan and deadlines for the plaintiff to complete a number of tasks and for her to draft a number of legal documents, including a complex brief. Everyone acknowledged that plaintiff would have difficulty completing the assigned tasks on time. Nevertheless, the next day, Ms. Christopher and Mr. Alexander called the AUSA and moved up most of the plaintiff's deadlines. At the time, Ms. Christopher and Mr. Alexander knew that plaintiff's son's wedding was at the end of the month; that the plaintiff had two elementary school age children at home; and that her husband was still experiencing some problems related to the shooting.

d) On Friday, March 30, 2007, plaintiff was hosting a large rehearsal dinner for her son's wedding. At the exact time that the rehearsal dinner began, Mr. Alexander sent plaintiff an email instructing her to complete a complex legal document for filing on Monday and to allow him 24 hours to review a draft, which was of course impossible.

31.    On April 16, 2007, plaintiff learned that she was going to be suspended without pay for 14 days, but she did not know why. Plaintiff was shocked and frightened. During her 15 year tenure at HUD, plaintiff had never heard of an employee being suspended without pay for any reason.

32.    On April 17, 2007, plaintiff's co-worker, OOL Senior Trial Attorney William Lane met with Ms. Christopher and asked her not to suspend plaintiff without pay. Ms. Christopher responded that she must go forward with the suspension or else the plaintiff and OOL staff attorney Terri Roman would "win the cabal." Plaintiff was totally confused by Ms. Christopher's response and had no idea how to resolve the conflict with Ms. Christopher.

33.    Plaintiff's friend and co-worker, OOL trial attorney Terri Roman, arranged a meeting with HUD General Counsel Robert Couch, for plaintiff, Ms. Roman, OOL Senior Trial Attorney William Lane, and OOL Trial Attorney David Reizes. At the meeting on April 17, 2007, the four OOL attorneys reported that the older, experienced female attorneys in the

11

OOL were treated differently and less favorably than their male counterparts. The General Counsel asked them about Mr. Alexander's supervision of their cases. The four OOL attorneys reported that Mr. Alexander closely scrutinized and unfairly criticized the work of the female attorneys and not the male attorneys. The OOL attorneys asked the General Counsel to prevent the two week suspension of the plaintiff.

34.     At the conclusion of the meeting, the General Counsel asked the plaintiff to stay. Privately the General Counsel told plaintiff that he would prevent her suspension if she would do a "brain dump" (his exact words) and teach Ms. Christopher and Mr. Alexander the technical defenses that the OOL uses to defend its cases. Plaintiff asked the General Counsel for clarification and restated her understanding of his position: "Do you mean that in order to avoid being suspended without pay for two weeks, presumably for errors that my supervisors found during their review of my work, I have to teach my supervisors the technical defenses so that they will know how to review my work?" The General Counsel smiled and said "yes." Plaintiff agreed to provide training for Ms. Christopher and Mr. Alexander on brief writing and the technical defenses.

35.     On April 26, 2007, Mr. Alexander served plaintiff an Official Reprimand based on false, contrived examples of plaintiff's poor performance.

36.     Plaintiff initiated the informal administrative process for the investigation and determination of her discrimination claims in the HUD EEO Office, the Office of Departmental Equal Employment Opportunity (ODEEO).

37.     In late April and May 2007, the atmosphere in the OLL was extremely hostile for plaintiff and for her friend and supportive co-worker, Terri Roman. Among many other unpleasant things, the following occurred:

12

a) Ms. Christopher regularly stalked up and down the hallway outside plaintiff's office, where she had no reason to be. Ms. Christopher would stop at plaintiff's door and stare and scowl and clench and unclench her fists. Her actions frightened plaintiff.

b) Although Ms. Christopher and Mr. Alexander knew that plaintiff was working long hours to keep up with their assignments, they questioned plaintiff's time and attendance. Plaintiff had to let them know each time she left her desk.

c) On May 2, 2007, Ms. Christopher prevented plaintiff's transfer to a litigation position in OGC's RESPA Enforcement Division.

d) On May 16, 2007, as the General Counsel required, plaintiff presented a training on brief writing and the technical defenses that the OOL relied on to defend its cases. Mr. Alexander attended and he was clearly very angry that plaintiff was presenting the training. He scowled at plaintiff and she found his mannerisms physically threatening.

e) Because Ms. Roman had arranged the April meeting with the General Counsel to try to prevent plaintiff's suspension without pay, Ms. Christopher and Mr. Alexander began to scrutinize Ms. Roman's time and attendance and they significantly increased their arbitrary, unfair criticism of her work. Ms. Román reported their retaliatory actions to the General Counsel and he told her that he would not assist her.

f) Mr. Alexander put Ms. Roman's unsigned step increase form in the middle of his desk, facing out. Several times Mr. Alexander called plaintiff into his office so she would see the unsigned form. Others in the OOL also noticed the form and they agreed that Mr. Alexander was delaying Ms. Roman's routine step increase, because she arranged for the April meeting with the General Counsel and she continued to be a supportive friend to plaintiff.

g) On May 22, 2007, Ms. Roman was given five minutes notice of an interview for three supervisory position in the OOL for which she had applied. During the interview, it was made very clear to Ms. Roman that she would not be selected for any of the positions.

38.     By June of 2007, plaintiff had been employed as a litigation attorney for almost 20 years, because she enjoyed litigation work. On June 10, 2007, to escape the hostile environment in the OOL, the plaintiff was forced to accept a non-litigation position in the Office of General Counsel's Office of Regulatory Affairs, GSE-RESPA.

13

39.     On June 25, 2007, Ms. Christopher and Mr. Alexander falsely accused Ms. Roman of stealing a document for the plaintiff to use as evidence in her administrative EEO case.   Ms. Christopher and Mr. Alexander launched a very public investigation into the bogus accusation against Ms. Roman.   Among other things, over several days, they repeatedly interrogate Ms. Roman and other members of the OOL staff about their knowledge of certain facts regarding the false allegation.   Ms. Christopher and Mr. Alexander also consulted multiple HUD officials about the sanctions that they could take against Ms. Roman for her alleged theft of material for the plaintiff's EEO case.

40.     On June 26, 2007, plaintiff received her first negative performance evaluation in her 15 years of federal service.

41.     Prior to arranging the April 2007 meeting with the General Counsel, for 20 years Ms. Roman had received consistently outstanding annual evaluations of her work. After the April 2007 meeting, among other things, the following occurred:

a) On July 24, 2007, Ms. Roman received her first negative performance evaluation in her 20 years of federal service.

b) On January 28, 2008, Ms. Roman returned to work after a two month leave of absence and she was served a Performance Improvement Plan, based on false, contrived allegations of poor performance.

c) On May 2, 2008, Ms. Roman was served an "Opportunity to Improve" based on false, contrived allegations of poor performance.

d) On October 21, 2008, the Office of Litigation issued a proposal to terminate Ms. Roman's federal service, based on false, contrived allegations of poor performance.

e) On January 26, 2009, Deputy General Counsel John Harold denied the proposal to terminate, in a very brief decision based on procedural grounds.

42.     In July 2007, Ms. Christopher began requesting that various federal law enforcement bodies investigate whether Ms. Roman or the plaintiff were routinely

breaking into Ms. Christopher's computer at night. Ms. Christopher allegedly suspected that the plaintiff and Ms. Roman were stealing documents that would support plaintiff's EEO claims. According to evidence in the *Roman* case, for months Ms. Christopher continued to falsely accuse Ms. Roman, but multiple investigations failed to uncover any evidence to support Ms. Christopher's false allegations against Ms. Roman.

43.     In January 2008, Ms. Christopher falsely accused the plaintiff of an attempted violent felony. According to evidence in the *Roman* case, Ms. Christopher filed a complaint with the General Counsel alleging that the plaintiff left nail laced cupcakes at the 2007 Office of Litigation (OOL) holiday party. Ms. Christopher's outrageous accusation was that plaintiff attempted to cause serious physical injury to plaintiff's former co-workers and friends who worked in the OOL.

44.     Knowing that plaintiff was still dealing with issues related to the violent crime against her husband, Ms. Christopher accused plaintiff of an attempted violent felony, because the accusation would be especially troubling to plaintiff.

45.     Based on Ms. Christopher's bogus accusation, the General Counsel arranged for two federal law enforcement bodies to investigate the alleged crime. As part of the investigations, Ms. Christopher filed a statement that she suspected the plaintiff, because she had filed an EEO complaints against Ms. Christopher. In fact, plaintiff's EEO complaint was the only reason plaintiff was accused of an attempted violent felony. In the *Roman* trial Ms. Christopher testified that she did not think the plaintiff was a violent person.

46.     Investigators reviewed records for the days surrounding the alleged crime to determine what hours the plaintiff was at work. The investigators then watched tapes from surveillance cameras in the HUD building to determine whether plaintiff brought any

baked goods to the office on those days.  According to the investigative reports, which were

evidence in the *Roman* case, the investigators questioned members of the OOL staff at least

once about the incident and several staff member were questioned more than once and

were required to provide written statements regarding their knowledge about the alleged

attempted violent felony.

47.     Plaintiff was embarrassed by the false accusation that she attempted to maim

her former co-workers and friends in the OOL.  She was stunned that the investigators took

the ridiculous accusation seriously.  And, it frightened her to know that OGC management

officials would seemingly do and say anything to scare plaintiff and to discourage her from

continuing to pursue her protected rights under Title VII.

48.     On March 7, 2008, Ms. Roman was served a Proposal to Suspend Without Pay

for Five Days.  One of the three "specifications" in the proposal was the false and absurd

accusation that Ms. Roman stole a document for the plaintiff, because the plaintiff wanted

the document to use as evidence to support her administrative EEO complaint.

49.     During the summer of 2008, the investigator assigned to plaintiff's EEO case

asked members of the OOL staff to respond to investigative questions about the plaintiff's

EEO claims.  The OOL staff were afraid to cooperate with the investigation because they

had witnessed what happened to Ms. Roman and what continued to happen to Ms. Roman

because she supported the plaintiff.  Most of the OOL staff never even acknowledge their

receipt of the investigator's requests for information.    Only Ms. Roman and OOL

Administrative Assistant Pinkey Elliott agreed to communicate with the investigator.

50.     During the period when the OOL staff received requests for information from

the investigator assigned to plaintiff's EEO case, in order to discourage their cooperation

with the investigation, OGC management arranged for the OOL staff to observe the following events, among others:

a) On June 6, 2008, Ms. Christopher sent a bogus email to a printer Ms. Roman was using. The email purported to be from Deputy General Counsel Linda Cruciani authorizing the involuntary transfer of Ms. Roman to Birmingham, Alabama. The OOL staff learned about the email and that Ms. Roman was extremely upset by the email.

b) On June 17, 2008, three agents from the Special Investigations Unit from HUD's Office of Inspector General (OIG) arrived in the OOL and took Ms. Roman's hard drive, to conduct an investigation of alleged unlawful acts by Ms. Roman. The actions of the agents were observed by the OOL staff.

c) On June 18, 2008, Ms. Cruciani notified the plaintiff that she must report to OIG agents for interrogation in less than 15 minutes. Plaintiff was not told at the time, and she has never been told, whether she was or is the subject of an OIG investigation.

d) On August 19, 2008, Ms. Roman was suspended without pay for two days based on a false accusation that she "lacks candor."

e) On August 22, 2008, Ms. Roman was required to report to OIG agents for interrogation as a subject of investigation.

51. On February 11, 2009, after the Office of General Counsel's failed attempt to terminate Ms. Roman's federal service of more than 20 years based on bogus, contrived allegations of poor performance, OGC involuntarily transferred Ms. Roman from the Office of Litigation to the Office of Administrative Enforcement.

52. On October 9, 2009, the fifth older, accomplished female staff attorney, Marianne Morris, was terminated by Ms. Christopher without any advance notice. Prior to her termination, Ms. Morris received only positive evaluations of her work from her OOL supervisors.

53. In January 2010, Deputy General Counsel Linda Cruciani, interfered and prevented plaintiff's lawful transfer to the newly created Federal Housing Finance Agency.

54.     After July 2010, Ms. Cruciani interfered and prevented plaintiff from accepting a very desirable detail to the newly created Consumer Financial Protection Bureau.

55.     Between August 2010 and June 2011, Ms. Cruciani arranged for plaintiff to be assigned the dirty, undesirable task of sorting, organizing and shredding thousands and thousands of documents that were to be transferred to the newly created Consumer Financial Protection Bureau.  For months, plaintiff repeatedly filled a large rolling dumpster with old records to be shredded.  Plaintiff then rolled the dumpster to HUD's basement to use a large industrial shredder.  During this period, Ms. Christopher also repeatedly threatened that plaintiff may lose her federal job.

## C.  Retaliatory Administrative Processing of Claims

### Obstruction of the Statutory and Regulatory Processing Procedures

57.     To protect federal employees, Title VII authorizes the Equal Employment Opportunity Commission (EEOC) to "issue such rules, regulations, orders and instructions as it deems necessary and appropriate" to insure that "all personnel actions affecting employees...in executive agencies...shall be made free from any discrimination based on race, color, religion, sex, or national origin."

58.     The regulatory scheme established by the EEOC requires each federal agency to maintain an EEO Office to receive, investigate and decide discrimination complaints for its employees.  This regulatory scheme is designed to protect federal employees' right to a fast, fair, impartial and conflict-free investigation and determination of their EEO claims. The EEOC's Office of Federal Operations (OFO) hears and rules on employees' appeals from their agencies' decisions and the OFO is supposed to enforce compliance with its orders.

59.     At HUD the EEO Office that is responsible for the fast, fair, impartial and conflict-free investigation of employees' EEO complaints is the Office of Departmental Equal Employment Opportunity (ODEEO).

60.     The EEOC regulations governing the processing of federal sector discrimination complaints are in 29 C.F.R. PART 1614.  EEOC Management Directive 110 provides interpretative guidance on the Part 1614 regulations.  MD 110 describes in detail the procedures each federal agency's EEO Office is required to follow in its processing, investigation and determination of Title VII complaints.  HUD's ODEEO is required to comply with EEOC's regulations and guidance when it receives, investigates and decides discrimination complaints filed by HUD employees.

61.     Of particular relevance to this case are the statutes, regulations and guidance that require federal officials to avoid actual and perceived conflicts of interest.  The law requires HUD to create impenetrable conflict walls between those in its Office of General Counsel (OGC) who will provide advice on a discrimination complaint, including in particular:

(a) OGC attorneys who will advise the Responsible Management Officials (RMOs) named in the complaint;

(b) OGC attorneys who will advise the ODEEO on its processing, investigation and determination of the complaint;

(c) OGC attorneys who will defend HUD in any administrative or judicial action arising out of the complaint; and

(d) OGC attorneys who will advise HUD's personnel office on any proposals to take an adverse employment action against the employee who filed the discrimination complaint.

62.     HUD's EEO Office (ODEEO) did not provide the plaintiff a process that was fast or fair or complete or impartial or conflict free.  And, the Office of General Counsel did

not establish required conflict walls to insure separation among its attorneys who would provide advice to the Responsible Management Officials (RMO), to the EEO Office (ODEEO), and to the personnel office.   Instead, evidence in the *Browne* and *Roman* cases demonstrates that one of the named RMOs in plaintiff's EEO complaints, Deputy General Counsel Linda Cruciani, supervised, controlled, and directed all of the OGC attorneys that had any involvement in the processing of plaintiff's EEO complaints.

63.     In addition, for over ten years, OGC and ODEEO collaborated to prevent the impartial investigation and determination of the plaintiff's gender-based discrimination and retaliation claims.  Evidence in the *Browne* and *Roman* cases demonstrate that OGC and ODEEO operated in unison to discourage plaintiff from continuing to pursue her protected rights under Title VII.

64.     During the failed ten year processing of the plaintiff's complaints, Deputy General Counsel Cruciani, those under her supervision, and the HUD EEO Office (ODEEO) were unrelenting in their efforts to discourage plaintiff from continuing to pursue her EEO claims.  Some of their retaliatory actions included:

a) failing and refusing to conduct an impartial investigation of all of the plaintiff's discrimination and retaliation claims, including Ms. Christopher's contrived, career ending, adverse acts of discrimination against the five, older, accomplished female attorneys who were involuntarily removed by Ms. Christopher from their positions in the Office of General Counsel's Office of Litigation;

b) replacing multiple investigators when HUD officials were dissatisfied with the comprehensive nature or the results of the investigation; and removing affidavits and documents from official investigative files;

c) chopping up plaintiff's discrimination and retaliation claims into multiple progressive administrative complaints and then dismissing plaintiff's claims because those claims were not included in earlier complaints;

d) failing to meet most regulatory deadlines by months and sometimes by years, while requiring plaintiff to strictly adhere to all deadlines (which were often very short and challenging for the plaintiff) to avoid the dismissal of her complaints;

e) lying and knowingly encouraging others' to misstate facts, including in sworn testimony;

f) openly and flagrantly defying appellate orders of the Equal Employment Opportunity Commission, which required HUD to conduct an appropriate, impartial investigation and determination of plaintiff's discrimination and retaliation claims;

g) replacing investigative affidavits of OGC officials to include new defenses after the investigation was closed;

h) providing false and contradictory instructions to the plaintiff during the processing of her complaints to create circumstances in which the plaintiff's retaliation complaints could be dismissing;

i) dismissing, without investigation, every retaliation claim in the plaintiff's complaints;

j) refusing to comply with a regulation that permits the consolidation of complaints; and

k) preventing plaintiff from lawfully obtaining documents relevant to her claims by refusing to comply with the regulations governing the Freedom of Information Act (FOIA) and defying multiple appellate orders to comply with FOIA and produce requested documents.

65.     Some of OGC's and ODEEO's actions to prevent the administrative processing, investigation, and determination of the plaintiff's claims are summarized below .

### Summary of Failed, Retaliatory Processing of 2007 Complaint

66.     On April 24, 2007, the plaintiff initiated the informal administrative EEO complaint process with HUD's Office of Departmental Equal Employment Opportunity (ODEEO). On August 3, 2007, the plaintiff filed a formal administrative complaint alleging that the defendant discriminated and retaliated against her. On October 18, 2007, the plaintiff filed an amended complaint adding additional allegations of discrimination and retaliation.

67.     On August 23, 2007, plaintiff participated in a bad faith mediation of her claims.  Management officials from the Office of General Counsel (OGC) used information they obtained at the plaintiff's mediation in a bogus petition to suspend Ms. Roman without pay.

68.     In November 2007, ODEEO notified plaintiff that it would not investigate most of the claims in her 2007 Complaint.

69.     In January 2008, a private EEO investigator, Jane Lindemann, was assigned to investigate both the plaintiff's and Ms. Roman's EEO complaints.  After the assignment of Investigator Lindemann, OGC officials engaged in vicious retaliation against the plaintiff and Ms. Roman.

70.     On February 14, 2008, plaintiff received 249 Investigative Affidavit Questions prepared by Investigator Lindemann.  The ODEEO allowed the plaintiff 15 days to respond and denied plaintiff's request for sufficient additional time to research and draft 249 answers.  As a result, plaintiff missed several days of work and was forced to work late nights to comple her responses.

71.     During the summer of 2008, Investigator Lindemann was unable to obtain information from many potential witnesses, who could support plaintiff's claims.  Most were afraid to even acknowledge their receipt of Investigator Lindemann's request for information.

72.     During the summer of 2008, at the same time that OGC managers were responding to investigative affidavits in the plaintiff's EEO case, Ms. Roman was subject to vicious retaliation by those OGC managers.

73.     On September 23, 2008, plaintiff received 82 Rebuttal Affidavit Questions prepared by Investigator Lindemann.  Plaintiff was allowed 7 days to respond and the ODEEO denied plaintiff's request for additional time.  Again plaintiff was forced to miss work and work late nights researching and drafting her answers to the 82 rebuttal questions.

74.     In October 2008, Investigator Lindemann was ordered by the ODEEO to immediately prepare a Report of Invesigation (ROI) on the plaintiff's claims.  Investigator Lindemann completed report was reviewed and rejected by the ODEEO.

75.     On March 10, 2009, the ODEEO notified the plaintiff that her case had been reassigned to Investigator Kim Raber to write an investigative report.  ODEEO Director Jerry Holloway lied to the plaintiff.  He told the plaintiff that Ms. Lindemann took a new job and never wrote a report on her comprehensive investigation of the plaintiff's factual allegations and claims.

76.     After the assignment of the Investigator Raber, and in violation of the EEOC's regulations and policy, investigative affidavits and documents were removed from the plaintiff's investigative file; the investigative affidavits of OGC management officials were removed from the investigative file and were replaced with revised affidavits that included new defenses to plaintiff's claims; and supportive documentary evidence was not obtained or considered by Investigator Raber.

77.     In November 2009, the plaintiff received the Report of Investigation that was prepared by Investigator Raber.  The report, which failed to address the factual allegations and claims in plaintiff's complaint, was totally inadequate.  Plaintiff felt that she had wasted

two and a half years and hundreds of hours of her time on the intentionally failed processing an investigation of her claims.

78.     A year later, on November 2, 2010, based on the inadequate ROI prepared by Investigator Raber, the ODEEO issued its Final Agency Decision (FAD) on the 2007 Complaint. In consultation with the Office of General Counsel, the ODEEO found that no discrimination or retaliation occurred.

79.     In December 2010, the plaintiff filed an appeal of HUD's FAD on the 2007 Complaint with the U.S. Equal Employment Opportunity Commission (EEOC).

80.     Almost two years later, on November 21, 2012, the EEOC issued an order vacating HUD's Final Agency Decision (FAD) on the 2007 Complaint. The EEOC found that "[a] review of the record reflects that the Agency's FAD and investigation failed to address all of the Complainant's claims." The EEOC remanded the 2007 Complaint to the ODEEO to complete an adequate and appropriate supplemental investigation of the plaintiff's claims within 120 days. Despite repeated attempts by the plaintiff to secure compliance, the ODEEO would not comply with terms of the EEOC's Remand Order.

81.     EEOC regulation 29 C.F.R. § 1614.106(d) provides that "[a] complainant may amend a complaint at any time prior to the conclusion of the investigation to include issues or claims like or related to those raised in the complaint."

82.     On February 14, 2013, pursuant to 29 C.F.R. § 1614.106(d), the plaintiff notified HUD's EEO Office that her 2007 Complaint was amended to include the issues and claims in her then-pending 2011 Complaints.

83.     On February 14, 2013, the plaintiff also notified HUD's EEO Office that its supplemental investigation of the 2007 Complaint must include the "issues and claims" in

24

the 2010 and 2011 Complaints. The ODEEO has consistently refused to acknowledge it receipt of the plaintiff's 29 C.F.R. § 1614.106(d) notification of the consolidation of the issues and claims in the 2007, 2010, and 2011 Complaints.

84.    After the EEOC issue its November 21, 2012 order vacating and remanding the 2007 Complaint for reinvestigation, the plaintiff made repeated unsuccessful attempts to secure ODEEO's compliance with the requirements of the remand order.

85.    On June 21, 2013, pursuant to 29 C.F.R. § 1614.503(a), the plaintiff petitioned the EEOC to enforce its November 21, 2012 Remand Order and to sanction HUD for its failure to comply with the Remand Order. For months the plaintiff made repeated efforts to get the EEOC to consider and decide the plaintiff's petition, as the EEOC's own regulation required it to do.

86.    At some point in late 2013, the plaintiff received a folder that purported to be the ODEEO's supplemental investigation of the 2007 Complaint, however, the folder did not contain any of the supplemental information that the EEOC ordered the ODEEO to obtain. Instead the folder contained parts of email communications between the ODEEO and the plaintiff and a deceptive statement by ODEEO former Team Lead Theresa Marshall. In her statement, Ms. Marshall made the false and absurd allegation that HUD was unable to comply with the terms of the EEOC's November 2012 Remand Order, because Ms. Marshall had difficulty contacting the plaintiff and the plaintiff refused to cooperate in a supplemental investigation of her 2007 Complaint.

87.    On January 12, 2015, while the plaintiff continued to wait for the EEOC to consider and decide her petition to enforce, the plaintiff received a notice that the EEOC had assigned an Administrative Judge to hold an administrative trial on the 2007

Complaint. Since an EEOC decision on the petition to enforce the 2012 Remand Order would render an administrative trial unnecessary, the plaintiff requested and was granted a stay of the administrative trial until the EEOC ruled on the petition to enforce.

88.   After multiple unsuccessful attempts by the plaintiff to get the EEOC to considered and ruled on her petition to enforce the November 2012 Remand Order, the plaintiff gave up.

89.   On November 24, 2015, at the plaintiff's request, the EEOC ordered (a) the 2007 Complaint be returned to ODEEO and (b) ODEEO issue a second Final Agency Decision (FAD) on the 2007 Complaint.

90.   Since the ODEEO never conducted a supplemental investigation of the claims in the 2007 Complaint, the ODEEO had nothing on which to base a second Final Agency Decision (FAD). So, instead of issuing a second FAD as the EEOC ordered, in mid-April 2017, the ODEEO issued what purported to be an order dismissing the 2007 Complaint. The purported order was signed by Michelle Hart, for Tami L. Wright, Manager, EEO Division, ODEEO.  The purported order repeats the same completely false and absurd allegation that the plaintiff refused to cooperate with the ODEEO's efforts to comply with the EEOC's 2012 Remand Order, including the requirement that the ODEEO conduct a supplemental investigation of the allegations and claims in the 2007 Complaint.

91.   The ODEEO's April 2017 purported order of dismissal includes a statement that the plaintiff may file this action.  Plaintiff initiated this action within 90 days after service of the purported order.  The plaintiff timely exhausted the administrative remedies available to her.

**Summary of Failed, Retaliatory Processing of 2010 Complaint**

92.     On January 28, 2010, the plaintiff filed a second amendment to her 2007 Complaint adding new allegations and claims of ongoing and continuous discrimination and retaliation by the defendant.

93.     On February 1-3, 2010, in an email exchange between former ODEEO Director Jerry Holloway and the plaintiff, Director Holloway refused to accept the amendments to the 2007 Complaint and instructed the plaintiff "to contact the [ODEEO's] EEO Counselor and begin anew with your new issues."

94.     On March 2, 2010, in reliance on the advice of Director Holloway, the plaintiff initiated informal counseling regarding ongoing and continuous acts of discrimination and retaliation by the defendant.

95.     On June 28, 2010, the plaintiff filed a formal administrative complaint.

96.     On August 16, 2010, the plaintiff amended her 2010 Complaint alleging additional acts of discrimination and retaliation by the defendant.

97.     The ODEEO refused to investigate the plaintiff's 2010 Complaint and its amendment.   Instead, on November 2, 2010, the plaintiff received the ODEEO's Final Agency Decision (FAD) dismissing the June 28, 2010 Complaint as like and related to the claims in her pending 2007 Complaint.  The FAD did not address the allegations the in the August 16, 2010 Amended Complaint.  The plaintiff timely appealed the dismissal of the 2010 Complaints to the U.S. Equal Employment Opportunity Commission (EEOC).

98.     In an Order dated November 21, 2012, the EEOC dismissed four paragraphs of the June 2010 Complaint for lack of jurisdiction and the EEOC upheld the dismissal of the remainder of the June 2010 Complaint as stating claims that were like and related to the claims in the 2007 Complaint.  As a result of the EEOC's November 2, 2010 Order, except

for the four paragraphs dismissed on jurisdictional grounds, the allegations in the June 2010 Complaint were incorporated into the 2007 Complaint. As stated in paragraph 91, with respect to the 2007 Complaint, the plaintiff exhausted her administrative remedies available and timely filed this action.

### Summary of Failed, Retaliatory Processing of 2011 Complaint

99.     On December 2, 2010, the plaintiff initiated the informal administrative EEO complaint process. ODEEO Counselor Denise Banks was assigned to the matter.

100.    On January 6 and 11, 2011, plaintiff met with Counselor Banks and they discussed the defendant's continuous acts of discrimination and retaliation against both the plaintiff and against witnesses who could provide supportive testimony regarding the plaintiff's EEO claims.

101.    On January 11, 2011, Counselor Banks provided her plan to conduct an informal investigation of the factual allegations of discrimination and retaliation in the plaintiff's EEO complaints. Counselor Banks expressed her concern that the ODEEO was not committed to the impartial investigation of discrimination and retaliation complaints, particularly complaints that named Responsible Management Officials (RMOs) in the Office of General Counsel (OGC). Counselor Banks confirmed the plaintiff's suspicion that the ODEEO regularly consulted with the named OGC RMOs about the processing of the EEO complaints that had been filed against them. Counselor Banks confided that she had a disagreement with her supervisor, ODEEO former Director Jerry Holloway, about her plan to conduct an informal factual investigation of the plaintiff's allegations. And, as a result, Director Holloway was retaliating against Counselor Banks, including severe criticism of

the manner in which she performed her counseling responsibilities. After January 11, 2011, the plaintiff never heard from Counselor Banks again.

102. On May 25, 2011, the plaintiff was contacted by ODEEO Counsel Erica Selman. Counselor Selman advised the plaintiff that she was replacing Counselor Banks. Counsel Selman stated that the file on plaintiff's case did not contain any information on Counselor Bank's informal factual investigation. And, that she was not at liberty to explain why the plaintiff's informal complaint was reassigned or what happened to Counselor Banks, except that Counselor Banks "was no longer in the building."

103. On June 13, 2011, the plaintiff filed a formal administrative complaint alleging additional acts of discrimination and retaliation by the defendant.

104. In August 2011, the plaintiff and former ODEEO Director Holloway exchanged contentious correspondence regarding the single, limited claim that ODEEO would agree to investigate.

105. On August 24, 2011 the plaintiff was notified that private contractor David Hunter was assigned to investigate the plaintiff's 2011 Complaint.

106. In October and November 2011, plaintiff spent hundreds of hours researching and drafting answers to dozens of investigative interrogatory questions and securing and compiling dozens of documents that were transmitted to Investigator Hunter in support of her claims.

107. On March 20, 2012, the plaintiff received the ODEEO's Report of Investigation (ROI) on the 2011 Complaint. The ROI (a) is not signed by Investigator Hunter, despite the fact that Investigator Hunter completed the investigation; (b) is very short, despite the fact that the plaintiff provided significant supportive information and

documentation regarding the claims and allegations in the 2011 Complaint; and (c) states, without support, that the assigned investigator concluded that the plaintiff had not presented any evidence in support of a claim that could be investigated.

108.    On February 14, 2013, pursuant to 29 C.F.R. § 1614.106(d), the plaintiff notified the ODEEO that her 2007 Complaint was amended to include the issues and claims in her pending 2011 Complaint.  The plaintiff also notified the ODEEO that the ODEEO's supplemental investigation of the 2007 Complaint (required by the EEOC's November 2012 Order) now must include the "issues and claims" in the 2011 Complaint.

109.    In late August 2013, the plaintiff received the ODEEO's Final Agency Decision (FAD) on the 2011 Complaint.  The FAD dismissed all of the claims because they were either (a) res judicata because the claims in the 2011 Complaint were the same as the claims decided by the EEOC in the 2007 and 2010 Complaints or (b) the plaintiff failed to establish prima facia evidence to support the claims.  The plaintiff timely appealed the FAD on the 2011 Complaint to the Equal Employment Opportunity Commission.

110.    In an order dated January 16, 2015, the EEOC reversed the ODEEO's FAD and remanded the 2011 Complaint to the ODEEO to complete an appropriate investigation within 150 days.  The ODEEO failed to comply with the terms of the EEOC's Remand Order.

112.    On February 16, 2017, the plaintiff was served (by mail with signature confirmation) the ODEEO's second Final Agency Decision dismissing the 2011 Complaint. The FAD finds that all of the claims in the 2011 Complaint allege dissatisfaction with the processing of her 2007 and 2010 Complaints.  And, that EEOC regulation requires the dismissal of such claims, because such claims must be raised as part of the 2007 and 2010

Complaint.  The FAD does not address the fact that plaintiff consolidated the claims in her 2007, 2010, and 2011 Complaints on February 14, 2013.

113.    Plaintiff initiated this action less than 90 days following service of the Final Agency Decision on the 2011 Complaint.  In addition, the 2007 and 2011 Complaints were consolidated on February 14, 2013.  And, as stated in paragraph 91, with respect to the 2007 Complaint, the plaintiff exhausted her administrative remedies and timely filed this action.

## IV.  CLAIMS FOR RELIEF

### COUNT I
### (Discrimination – Hostile and Abusive Work Environment)

114.    Plaintiff repeats the allegations contained in paragraphs 1 through 113 above, as though fully set forth here.

115.    Plaintiff is a female.

116.    Beginning no later than January 2007, defendant intentionally subjected the plaintiff to a discriminatory hostile and abusive work environment by the following actions, among others:  removing four older, accomplished, female staff-level attorneys from the Office of Litigation; the hostile, condescending supervision of plaintiff's work; stalking plaintiff; threatening to suspend plaintiff for two weeks without pay; officially reprimanding plaintiff based on false, contrived allegations of bad performance; preventing the plaintiff from accepting a litigation position in another office; and assigning an impossible amount of work, with short deadlines, to create circumstances in which the plaintiff would fail to meet her supervisors' demands.

117.    By the foregoing actions and others, defendant took adverse employment action against the plaintiff by subjecting the plaintiff to a severe and pervasive, hostile and

abusive work environment and discriminated against the plaintiff because of her sex, and thereby materially and adversely altered the terms and conditions of her employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16.

118.    Defendant's violation of Title VII caused plaintiff to suffer injury to her career and professional reputation, emotional pain, embarrassment, humiliation, mental anguish, inconvenience, and loss of enjoyment of life.

## COUNT II
### (Retaliation – Hostile and Abusive Work Environment)

119.    Plaintiff repeats the allegations contained in paragraphs 1 through 118 above, as though fully set forth here.

120.    Plaintiff engaged in protected EEO activity when she opposed defendant's unlawful employment practices beginning no later than January 16, 2007, when she notified her second-line supervisor that her first-line supervisor was extremely hostile and condescending to plaintiff.

121.    Plaintiff participated in protected EEO activity beginning no later than April 24, 2007, when she sought EEO counseling; August 3, 2007, when she filed her first formal EEO complaint; and continuing thereafter when she pursued the formal administrative EEO complaints process.

122.    Beginning no later than January 2007, defendant intentionally subjected the plaintiff to a retaliatory hostile and abusive work environment by the following actions, among others: falsely accusing plaintiff of an attempted, violent felony; falsely accusing plaintiff of non-violent criminal activity; preventing plaintiff's transfer to a newly created federal agency; threatening plaintiff's removal from federal service; and assigning plaintiff dirty, unpleasant tasks.

123.    By the foregoing actions and others, defendant took materially adverse action against the plaintiff that would dissuade a reasonable worker from making or supporting a charge of discrimination or opposing unlawful employment practices.

124.    By the foregoing actions and others, defendant subjected plaintiff to a severe and pervasive, hostile and abusive work environment and retaliated against plaintiff because of her protected EEO activity, and thereby materially and adversely altered the terms and conditions of her employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16.

125.    Defendant's violation of Title VII caused plaintiff to suffer injury to her career and professional reputation, emotional pain, embarrassment, humiliation, mental anguish, inconvenience, and loss of enjoyment of life.

## COUNT III
### (Retaliation – Hostile and Abusive Acts Against Terri Roman For Support Provided to Plaintiff)

126.    Plaintiff repeats the allegations contained in paragraphs 1 through 125 above, as though fully set forth here.

127.    Plaintiff engaged in protected EEO activity when she opposed defendant's unlawful employment practices beginning no later than January 2007.

128.    Plaintiff participated in protected EEO activity beginning no later than April 24, 2007, when she sought EEO counseling; August 3, 2007, when she filed her first formal EEO complaint; and continuing thereafter when she pursued the formal administrative EEO complaints process.

129.    Beginning no later than April 17, 2007, defendant subjected plaintiff to abuse and hostility when defendant took the following materially adverse actions, among others,

against Terri Roman because she supported the plaintiff in the EEO process: repeatedly and falsely accusing Ms. Roman of criminal acts and causing the investigation of these false allegations; suspending Ms. Roman without pay; attempting to terminate Ms. Roman's federal service; impeding Ms. Roman's ability to accept new positions; and impeding Ms. Roman's ability to obtain promotions.

130.    By the foregoing actions and others, defendant took materially adverse action against the plaintiff that would dissuade a reasonable worker from making or supporting a charge of discrimination or opposing unlawful employment practices, and thereby materially and adversely altered the terms and condition of her employment in violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16.

131.    Defendant's violation of Title VII caused plaintiff to suffer emotional pain, embarrassment, humiliation, mental anguish, inconvenience, and loss of enjoyment of life.

## COUNT IV
### (Retaliation – Processing of EEO Complaints)

132.    Plaintiff repeats the allegations contained in paragraphs 1through 131 above, as though fully set forth here.

133.    Plaintiff engaged in protected EEO activity when she opposed defendant's unlawful employment practices beginning no later than January 17, 2007.

134.    Plaintiff participated in protected EEO activity beginning no later than April 24, 2007, when she sought EEO counseling; on August 3, 2007, when she filed a formal EEO complaint; and continuing thereafter when she pursued the formal administrative EEO complaints process.

135.    Beginning no later than April 24, 2007, when plaintiff initiated the administrative EEO process, the defendant has obstructed and prevented the legally

required impartial processing, investigation, and decision of the plaintiff's discrimination and retaliation claims.   Defendant intentionally subjected plaintiff to the following materially adverse acts, among others:

    a) failing and refusing to conduct an impartial investigation of all of the plaintiff's discrimination and retaliation claims, including Ms. Christopher's contrived, career ending, adverse acts of discrimination against the five, older, accomplished female attorneys who were involuntarily removed by Ms. Christopher from their positions in the Office of General Counsel's Office of Litigation;

    b) replacing multiple investigators when HUD officials were dissatisfied with the comprehensive nature or the results of the investigations; and removing affidavits and documents from official investigative files;

    c) chopping up plaintiff's discrimination and retaliation claims into multiple progressive administrative complaints and then dismissing plaintiff's claims because those claims were not included in earlier complaints;

    d) failing to meet most regulatory deadlines by months and sometimes by years, while requiring plaintiff to strictly adhere to all deadlines (which were often very short and challenging for the plaintiff) to avoid the dismissal of her complaints;

    e) lying and knowingly encouraging others to misstate facts, including in sworn testimony;

    f) openly and flagrantly defying appellate orders of the U.S. Equal Employment Opportunity Commission, which required HUD to conduct an appropriate, impartial investigation and determination of plaintiff's discrimination and retaliation claims;

    g) replacing investigative affidavits to include new defenses after the investigation was closed;

    h) providing false and contradictory instructions to the plaintiff during the processing of her complaints to create circumstances in which the plaintiff's retaliation complaints could be dismissing;

    i) dismissing, without investigation, every retaliation claim in the plaintiff's complaints;

    j) refusing to comply with a regulation that permits the consolidation of complaints; and

k) preventing plaintiff from obtaining supportive documents by failing to comply with the regulations implementing the Freedom of Information Act (FOIA) and defying multiple FOIA appellate determinations to comply with regulatory requirements to produce documents.

136.    By the foregoing actions and others, defendant took materially adverse action against the plaintiff that would dissuade a reasonable worker from making or supporting a charge of discrimination or opposing unlawful employment practices, and thereby materially and adversely altered the terms and condition of her employment in violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16.

137.    Defendant's violation of Title VII caused plaintiff to suffer emotional pain, caused plaintiff to waste thousands hours of time participating in a deliberately failed process; caused plaintiff frustration, embarrassment, humiliation, mental anguish, inconvenience, and loss of enjoyment of life.

**V.  PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Clare Harrigan respectfully requests that the Court enter judgment in her favor and award the following relief:

A.    An order declaring that defendant violated plaintiff's rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-16.

B.    Vitiation of the plaintiff's Official Reprimand.

C.    Compensation for leave used by the plaintiff as a consequence of defendant's unlawful acts.

D.    Compensatory damages in an amount to be determined at trial to compensate plaintiff for the emotional pain, frustration, embarrassment, humiliation,

mental anguish, inconvenience, career loss, loss of professional reputation and career opportunities, and loss of enjoyment of life cause by defendant's unlawful actions.

      E.      Attorneys' fees and costs

      F.      Such other relief as may be just and appropriate.

## VI. JURY DEMAND

      Plaintiff requests a trial by jury.

                            Respectfully submitted,

                            Clare Harrigan

                            Clare Harrigan
                            Pro Se Plaintiff
                            2100 Westview Terrace
                            Silver Spring, Maryland  20910
                            (240) 643-9277
                            Clareharrigan1@gmail.com

May 17, 2017